IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 14, 2025 Session

**IN RE ANIYA B. ET AL.**

**Appeal from the Juvenile Court for Sevier County**
**No. 2023-JT-12          Jeff D. Rader, Judge**

_____

**No. E2024-00588-COA-R3-PT**

_____

In this case involving termination of the parents' parental rights to their three minor children, the trial court found that two statutory grounds for termination had been proven by clear and convincing evidence: (1) abandonment by failure to financially support the children and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the children. The trial court further found that termination of both parents' parental rights was in the children's best interest. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Tananeka S.

Susan H. Harmon, Sevierville, Tennessee, for the appellant, Zachary B.

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

1.  Factual and Procedural History

This is an appeal from a final order entered on March 26, 2024, by the Sevier County Juvenile Court ("trial court") terminating the parental rights of Tananeka S. ("Mother") and Zachary B. ("Father") to their three minor children, Aniya B., Aurora B., and Gabriel B. (collectively, "the Children"). In May 2022, nearly two years prior to the termination

hearing, the Children had been taken into protective custody by the Tennessee Department of Children's Services ("DCS") after a domestic violence incident occurred in Father's home while the Children were present. Mother and Father had been separated since September 2018, after which the Children had lived primarily with Mother in Kentucky. However, approximately one month before the Children were taken into DCS custody in May 2022, Child Protective Services of Kentucky ("CPS") had removed the Children from Mother's care due to her marijuana usage and had placed them in the care of K.F., the godmother of Mother's youngest child, R.S. At some point thereafter, Father had taken the Children from K.F.'s care to live with him and his wife, K.B., in Tennessee. The Children had been living with Father and K.B. for approximately one month when they were removed into protective custody by DCS in Tennessee. The domestic violence incident at Father's home had resulted in Father's arrest on charges of aggravated assault, and the trial court subsequently determined the Children to be dependent and neglected pursuant to Tennessee Code Annotated § 37-1-102.[1] The Children have remained in protective custody since that time.

During the dependency proceedings, the trial court appointed a guardian *ad litem* for the Children and separate counsel for each parent. On June 6, 2022, DCS developed permanency plans for Mother and Father, respectively, regarding each of the three children. The plans were ratified by the trial court on August 17, 2022, and again on May 24, 2023. The parents were each granted four hours of visitation with the Children monthly pursuant to the permanency plan. However, in September 2022, DCS moved to stop the parents' visitation with the Children due to reported "reactive" behavioral problems exhibited by the Children following these visits. The trial court granted the motion to stop visitation on October 3, 2022. Upon subsequent motion filed by Mother, the trial court ordered the parents' visitation to be reinstated on November 30, 2022.

On June 22, 2023, DCS filed a petition to terminate Mother's and Father's parental rights to the Children ("the Termination Petition"). DCS averred that since the Children had been taken into protective custody, Mother had continued to "live an unstable lifestyle" and had failed a drug screen as recently as February 2023. Regarding Father, DCS alleged that Father's domestic violence problems continued, that Father did not possess a valid driver's license "due to a DUI [driving under the influence] charge from June 2022" yet continued to drive illegally, and that Father suffered from "bipolar and schizophrenia" for which he was not taking medication. DCS also averred that the Children continued to struggle with behavioral issues stemming from the "abuse and neglect" they had endured in "both parents' homes."

---

[1] This was not the first time the Children had been removed from the parents' custody and adjudicated dependent and neglected by the trial court. In 2019, the trial court placed the Children into protective custody with DCS in Tennessee due to Mother's drug use and environmental concerns in Father's home. The Children were subsequently returned to Mother's custody by order entered on August 21, 2019.

In the Termination Petition, DCS asserted two grounds for termination of Mother's and Father's parental rights: (1) abandonment by failing to financially support the Children during the four months preceding the filing of the termination petition and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. DCS also alleged that termination of Mother's and Father's parental rights was in the Children's best interest.

The trial court conducted a bench trial on February 1, 2024, during which the court heard testimony from both parents; Father's minor sister, L.B.; DCS Family Service Worker Christina Carroll; the Children's foster mother, Victoria S. ("Foster Mother"); and R.T., an acquaintance of Father.

On February 13, 2024, the trial court entered an order terminating Mother's and Father's parental rights to the Children. The trial court determined that clear and convincing evidence supported a determination that both parents had abandoned the Children by failing to support them financially during the four months preceding the filing of the Termination Petition and that both parents had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. The trial court also determined that termination of the parental rights of both parents was in the Children's best interest. Mother and Father have timely appealed.

## II. Issues Presented

In their respective appellate briefs, Mother and Father present the following issues for our review, which we have reordered and restated slightly:

1.     Whether the trial court erred by determining that Mother and Father had abandoned the Children by failing to pay child support during the four months preceding the filing of the Termination Petition.

2.     Whether the trial court erred by determining that Mother and Father had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.

3.     Whether the trial court erred by determining that termination of Mother's and Father's parental rights was in the Children's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The

trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d

4

838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Grounds for Termination of Mother's and Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2022, to current)[2] provides in relevant part:

> (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

> \* \* \*

> (c) Termination of parental or guardianship rights must be based upon:

> > (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

---

[2] Unless otherwise noted, throughout this Opinion all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the Termination Petition was filed and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at \*4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, such as this one, the subsection that was in effect at that time has not changed and therefore remains current.

(2)     That termination of the parent's or guardian's rights is in the best interests of the children.

In the final order, the trial court found that clear and convincing evidence supported the following grounds for termination of Mother's and Father's parental rights: (1) abandonment by failure to financially support the Children and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. We will address each ground in turn.

A.  Statutory Abandonment by Failure to Support

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) provides:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

The version of Tennessee Code Annotated § 36-1-102(1)(A) (West May 5, 2023, to June 30, 2023) in effect when the Termination Petition was filed provided the following definition of abandonment as pertinent here:

For purposes of terminating the . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i)     For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

The trial court determined that clear and convincing evidence supported a finding that both parents had abandoned the Children by failing to support them or make reasonable

6

payments toward their financial support during the relevant four-month statutory period, which it correctly found began on February 22, 2023, and ended on June 21, 2023 ("Determinative Period"). *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing). The trial court found that both parents had been ordered to report to child support court in August 2022.

## 1. Father

Concerning Father, the trial court included the following specific findings of fact regarding this ground:

> The Court notes that the father did not appear at [the August 2022 child support] court date and was ordered to pay $105.00 per month for each child including an additional $20.00 for child support arrears. The record indicates that the father has failed to make any child support payments and that he had been clear in his testimony that he had been employed during that time in making a minimum of $15.00 per hour. The father testified that he had been working for himself during most days but there was no indication that he had provided documentation of money received. As stated previously the father has filed no tax returns for at least a two-year period. Lack of proof indicates that the father had no intention of paying support and the Court finds his failure to pay support was proven by clear and convincing evidence.

In his answer to the Termination Petition, Father raised lack of willfulness as an affirmative defense to the ground of abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure."). The parent or guardian "shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of the evidence." *Id*. This Court has previously explained "willfulness" in the context of parental termination actions as follows:

> Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his

7

or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child . . . .

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted); *see In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

In his appellate brief, Father admits that he did not provide financial support for the Children during the Determinative Period or at any other time. However, Father contends that at the "time of the hearing" his counsel had asked for and been granted a "waiver of child support payments" but that this information "did not make its way into the order at the time." Father further asserts that he did not receive notification of the August 2022 hearing during which the trial court set child support. Father states that he should not be held accountable for the "mistake on the part of the State" in failing to send him a notification to appear in court regarding child support.

However, as Father acknowledges, there is nothing in the record demonstrating that he requested or received a waiver of his responsibility to financially support the Children at any time during the pendency of the proceedings. Instead, at the May 11, 2022 preliminary hearing following removal of the Children into DCS custody, the trial court informed both parents of their responsibility to support the Children financially. The trial court then set a hearing date for August 19, 2022, to determine the amount of child support that was to be paid by each parent. Both parents were present and represented by counsel at the preliminary hearing. The written order resulting from the preliminary hearing included the following notice regarding the parents' respective responsibilities to pay child support:

> Parents shall appear for a hearing on [August 19, 2022] at 9:00 AM in the Child Support Division of this Court to determine the ability of each to pay child support. [They] shall each bring documentation of current income including recent pay stubs. Failure to appear at this hearing may result in the issuance of a default judgment.

The order also advised the parents of the importance of paying support for the Children and stated that failure to do so would be grounds for termination of their parental rights. The record further includes a document entitled, "Criteria and Procedures for Termination

8

of Parental Rights," which Father signed on June 14, 2022. The document lists grounds for termination of parental rights and expressly instructs that a parent's "failure . . . to make reasonable child support payments for four (4) consecutive months immediately before the termination petition is filed" could result in termination.

During trial, Father testified that he had been working with a landscaping company for two years, beginning in May 2022, making $15.00 per hour and working "on average about forty hours a week in the summertime." Father admitted that he had the ability to financially support the Children during this time but that he had neither paid child support nor purchased any clothes or supplies for the Children from the time the Children were taken into DCS custody in May 2022 until the trial date. Father explained this failure by stating: "I was unaware that I was supposed to have been paying child support until I got my termination packet." After considering the evidence, the trial court concluded that Father "had no intention of paying support" for the Children; thus, the trial court found Father's failure to financially support the Children to be willful.

Upon thorough review, we agree with the trial court's conclusion that the ground of statutory abandonment had been established by clear and convincing evidence as it relates to Father's failure to financially support the Children. Father personally attended the preliminary hearing where the child support hearing date was set. Father signed a document that clearly stated that he was responsible for paying child support and that failure to do so could result in termination of his parental rights. Moreover, despite Father's argument to the contrary, it is well settled in Tennessee that a parent maintains an obligation to provide child support and is taxed with knowledge of that obligation even in the absence of a court order. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"); *State Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004) ("In Tennessee . . . the obligation to pay [child] support exists even in the absence of a court order to do so.") (citation omitted). Moreover, Father acknowledged that he had been employed during the Determinative Period and that he maintained the ability to pay support. Therefore, we affirm the trial court's determination that clear and convincing evidence established that Father had abandoned the Children by failing to provide financial support for them during the Determinative Period pursuant to Tennessee Code Annotated §§ 36-1-113(g) and 36-1-102.

### 2. Mother

The trial court also determined that clear and convincing evidence supported a finding that Mother had abandoned the Children by failing to provide them financial support during the Determinative Period. Concerning Mother, the trial court found:

> As it relates to the mother the Court notes that attorney for the mother, Greg Bennett, appeared on behalf of the mother at her child support hearing

in August 2022. At that hearing, the Magistrate awarded payments to be made on behalf of the mother and that the mother has failed to make any payments during the relevant period described above. The Court does note, as previously stated, that the mother made three payments in October and November 2023 but nothing otherwise. The mother testified that she had been working at all times relevant and there was no indication that her failure to pay was not willful. At some times the mother indicates the substantial amount of money had been paid to her but that no payments were made on behalf of the children. The mother provided no proof with regard to her actual expenses or obstacles which prevented her from taking care of the children or at least complying with the child support order. The Court finds the ground for failure to support was proven by clear and convincing evidence.

Like Father, Mother asserted lack of willfulness as an affirmative defense in her answer to the Termination Petition. However, for the same reasons that Father's lack of willfulness defense fails, Mother's also fails. Mother was present and represented by counsel at the May 11, 2022 preliminary hearing during which the trial court set the hearing to determine child support for August 19, 2022. Mother was also represented by counsel at the child support hearing during which the trial court determined that "effective August 2022" Mother was to pay a total of $150.00 per month ($50.00 for each child) in child support. The written orders memorializing Mother's child support obligation as to each child were signed by Mother's counsel that same day. Despite these orders, Mother never made any child support payments for the Children during the Determinative Period even though she was employed. Therefore, we find Mother's affirmative defense of lack of willfulness to be unavailing.

In her appellate brief, Mother acknowledges that the total amount of child support she should have paid during the Determinative Period was $600.00. However, she avers that during the Determinative Period, she "made four round trips to Tennessee to visit her children," and asserts that she is "entitled to reimbursement for mileage for each of those four round trips." Mother argues that her travel expenses incurred by reason of her visits to the Children should be credited to her as "in kind" payments of child support because DCS did not reimburse her for travel expenses or provide "gas vouchers" that were purportedly available. Calculating that her mileage reimbursement "would have totaled $1,591.38," Mother contends that this mileage reimbursement amount owed to her reflects an overpayment of her child support obligation of $991.38. Mother admits that she "could find no supporting case law or other authority for this argument."

"This Court has previously held that support need not be solely monetary, but can include in-kind gifts." *See In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *18 (Tenn. Ct. App. July 21, 2021) (citing *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *23 (Tenn. Ct. App. Mar. 12, 2013)). A parent can give

"the child in-kind support in the form of gifts, clothes, games, and food" during the Determinative Period, and such gifts can be considered as financially supporting the child. *See id*.

However, Mother presents no authority, and our research has revealed none, to support the proposition that unreimbursed mileage and travel expenses incurred by Mother in driving from Kentucky to Tennessee to visit the Children should be considered in-kind support for the Children. In reviewing the cases concerning "in kind" gifts, we note that such gifts are either given directly to the child or are used to directly benefit the child in some specific way, such as in the form of food, supplies, and clothing. *See, e.g.*, *In re Jayda J.*, 2021 WL 3076770, at *18; *In re Liberty T.*, No. E2022-00307-COA-R3-PT, 2023 WL 2681897, at *8 (Tenn. Ct. App. Mar. 29, 2023). Such gifts do not include reimbursement of a parent's expenses even when those expenses are incurred in visiting a child. For this reason, we determine that Mother's gas expenses incurred when she traveled to visit the Children do not amount to in-kind gifts to the Children. Hence, we find that Mother made no payments, either monetary or in-kind, for the Children's support during the Determinative Period. We therefore affirm the trial court's determination that DCS proved, by clear and convincing evidence, the statutory ground of abandonment by failure to support as it relates to Mother.

### B. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Children

The trial court found by clear and convincing evidence that Mother and Father had both failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) provides that termination of parental rights is warranted when

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Our Supreme Court has explained the following regarding this ground for termination of parental rights:

> Two prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in

11

the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The trial court determined that both prongs of this statutory ground had been met as to both Mother and Father by clear and convincing evidence.

### 1. Failure to Manifest an Ability and Willingness

Regarding the first prong of this statutory ground, our Supreme Court has instructed:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3 PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)).

### a. Mother

As this prong relates to Mother, the trial court delineated the following findings of fact:

> In support of this ground, the Court notes that numerous issues were proven by the state, much of it elicited by the mother's own testimony concerning her situation. The mother was clear during her testimony in this matter that she did not have appropriate housing for the children. It is important to note that housing has been a continuing problem since the children's removal from the mother in 2019 and moving forward. During her testimony the mother made statements concerning moves she had made since 2019. It was clear that the mother had lived with a boyfriend initially when the children were removed back in 2019. Subsequent to that she moved and stayed with her mother and a brother until that arrangement did not work. She then described the move that she made to Ashland, Kentucky living with a boyfriend and culminated in her moving in with her sister-in-law in 2020. Much of the testimony from the mother described abuse of the children and her at the hands of various partners including the father.
>
> A psychological evaluation provided that the mother exhibited instability and questionable parenting skills attributable to "drinking and

clubbing" during the years of 2020-2021. The mother testified that she has been dropping the children off to be watched while she fostered an unstable situation involving the children and the night life that was ongoing at that time. Apparently, a sister-in-law provided most of the care for the children during the mother's unstable times. The mother described her mother as being a drug addict and this necessitated in placing the children on "HUD" [United States Housing and Urban Development] in Kentucky to obtain benefits for their support. She apparently was able to obtain a two-bedroom apartment in 2022, as the only child with her at that time was her son.

The mother's testimony today indicates that she is living in Franklin, Ohio and continuing to apply for HUD housing based on a recent application that she had supplied to the department. The Court was very concerned by the lifestyle the mother has continued to lead since 2019. Clearly the mother still is a regular user of marijuana and describes the medical benefits to her and her mental state. The mother described psychological issues of PTSD [post-traumatic stress disorder], bipolar diagnosis, and that she was a regular user of tobacco products. Her testimony includes descriptions of several medications she takes to control her psychotropic problems and deal with sleeping issues. The specific medications and frequency of doses was supplied by her testimony in the record. It is important to note that in January 2024, the mother failed a urine drug screen for marijuana. Testimony of the mother indicates that she was using drugs while the children were with her. Clearly, the mother does not properly grasp the danger to which the children were exposed at the time these incidents were occurring.

Further disturbing to the Court was the mother's description of having left the children with [C.] (who apparently is the sister-in-law) where she admitted that there were at least twelve children living in that home at the time. The Court believes that the mother's mental health issues, drug use, lack of stability and history of abuse clearly indicate that she is not capable of taking custody of these children at this point in time or in the near future.

In addition, the mother has provided no documentation to this Court with regard to her income and has only paid child support approximately three times after the Petition to Terminate was filed with the Court. The mother's testimony today indicates that she worked for at least four years from the period of time 2018-2022 at Cheddar's. Since then, she has apparently tried numerous jobs none of which have lasted very long. She describes working at Buffalo Wild Wings in Kentucky as well as a gas station and now describes her work at a restaurant in the State of Ohio. Suffice it to say no documentation of any job and or income has ever been filed or included as an exhibit today. Her interactions with the children since the time

13

of their removal indicates that she clearly does not understand how to parent these children or to take care of their basic day to day needs.

On appeal, Mother argues that she has "clearly demonstrated her willingness and ability to assume legal and physical custody" of the Children. Mother asserts that she "has been approved for HUD housing with five bedrooms until her children were brought into DCS custody in Tennessee." Mother relies on Father's testimony that in his opinion, appropriate housing would resolve his "major concerns" with Mother's parenting. Mother points to testimony from Father's minor sister, L.B., who testified that although Mother "had her flaws," she was "a decent mother and that she never hit the children." Mother avers that the "Kentucky DCS case" against her was "ultimately unfounded and dismissed" and that she had regained custody of her child that was not related to Father.

Upon careful review of the record, we find that Mother's contentions here lack a sufficient evidentiary basis to preponderate against the trial court's determination that this statutory ground was established by clear and convincing evidence. First, we conclude that Mother's postulate that she had demonstrated her ability and willingness to parent because she had custody of one child, who was not Father's child, at the time of the Termination Hearing does not resolve the question of her ability and willingness to assume legal and physical custody of the Children in the instant case.

Concerning the Children in the case at bar, the evidence demonstrates that Mother experienced a history of housing instability, drug use, and mental illness that affected her ability to successfully parent. The Children had initially been removed from Mother's care due to Mother's drug use in 2019. Mother testified that since that time, she had continued to lack stable housing and continued to smoke marijuana. Afterward, Mother recounted that she had resided for about "a year or something" in a home where she paid rent to a "landlord" whom she described as a "slumlord." She explained that the "sheriff's Department and CPS was constantly knocking on [her] doors[.]" She further explained that she then moved into a home with a boyfriend who had physically abused her while she had custody of the Children and was pregnant with her fourth child. According to Mother, in the months leading up to the Children's removal from her custody and ultimately from Father's home in May 2022, she had been "evicted"; she had "ended up staying with [her] sister-in-law" who lived in HUD housing; and she had been awaiting her own HUD determination in Kentucky but could not stay with "blood family just because of past things" including her mother's drug addiction. Mother further relayed that during the time she lived with her sister-in-law and had "sole custody" of the Children, Mother would routinely "go out all night," to "have a drink with [her] friends for two or three hours" after getting off work at midnight, leaving the Children in her sister-in-law's care. Mother's testimony revealed that the sister-in-law was also a known drug user and had three children of her own. She testified that she had to leave her sister-in-law's house because there was a "drug problem at that house," so Mother began "staying in a hotel" and was put on "emergency HUD."

14

Mother's living situation did not improve after the Children were removed to DCS custody in May 2022. After the hotel, Mother had moved into a one-bedroom home for about two months with her youngest child, R.S., and had then moved into another house that was "being remodeled" such that it "didn't have the kitchen sink" and was missing a wall. During trial, Mother was still awaiting HUD housing and living in the house that was being remodeled, which had "nothing in the kitchen but walls and a refrigerator." In addition, Mother related that one of the reasons the Children were taken into DCS custody in May 2022 was partly her fault "because I was smoking marijuana." She stated that because it was her "third time for failing for marijuana," CPS in Kentucky took the Children from her care and placed them in the care of K.F., her other child's "godmother."

Testimony at trial further evinced that Mother's residential instability and inability to care for the Children were exacerbated by her mental health issues. Mother testified that she suffered from "PTSD," "bipolar," "severe depression," and "insomnia" and that she smoked marijuana "every now and then" to self-medicate for these conditions. Mother explained that during the time that she maintained custody of the Children—some time before they were taken into DCS custody in May 2022—she and her sister-in-law were residing with "twelve kids in the house." Mother went on to state: "It was a little crazy. Like that's why I checked myself into the psych ward and was going to kill my mother." Mother did not indicate or appear to acknowledge during her testimony that her expressed desire to kill her mother was in any way aberrant or inappropriate.

As part of the requirements of the permanency plan developed for Mother by DCS, Mother completed a psychological evaluation in December 2023. The evaluator produced a written report in which he determined that Mother suffered, *inter alia*, from "Bipolar 1 Disorder with psychotic features," "Post-traumatic stress disorder with dissociative traits and panic attacks," and moderate "Cannabis Use Disorder." The evaluator concluded that the "prognosis for effective parenting" was "very low" due to Mother's "limited support network," "limited insight into her condition," "inability to perceive her own accountability for current circumstances for herself and the children," marijuana use, and the fact that each of her children had exhibited "emotional reactivity" after visiting with Mother. Significantly, the evaluator took note that when questioned about her short-term and long-term goals for the future, Mother did not mention reunification with her Children as a goal.

Upon careful review, we conclude that due to Mother's chronically unstable housing situation, her continued drug use, her inability to take responsibility for her actions or to provide proper care for the Children, her apparent disinterest in reuniting with the Children, and her untreated mental illnesses, the trial court did not err in finding, by clear and convincing evidence, that Mother had failed to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Children.

b. Father

15

Concerning the first prong of this statutory ground as it relates to Father, the trial court included the following detailed factual findings:

> With regard to the father, the Court finds that the father has been arrested on numerous occasions and was described by the mother in her testimony as being "always abusive." She described him as having chased her with a knife when they first moved to Tennessee and that he was looking for some of his old girlfriends during the time when they were together. He was described as having a very abusive personality and numerous sexual encounters with others during the time in which the two of them were supposed to be together. She described physical abuse by the father including choking and striking her on more than one occasion. She stated that the father's abuse really began when Aniya was first born. Her testimony included numerous incidents of physical abuse, continuous violence, threats, and calls to the police. The father seemed to think this testimony was amusing and or funny while the Court was observing both of them today in court.
>
> The Court notes that the father denies the incidents of abuse and threats and it was surprising to the Court that the father believed that this testimony was amusing to say the least. The Court notes that the father was arrested on January 1, 2022, and plead guilty to the assault on a police officer. Testimony by a sister, [L.B.], age 14, described his violent behavior in the home when she lived in a one bedroom cabin with him, his wife, and the three children prior to their removal in May 2022. [L.B.] was very specific in testifying that he struck her at a time when he was inebriated after drinking Fireball and that he discharged a firearm on numerous occasions inside the house. The children apparently were not present at the time except for one of the children being present one time when the firearm was fired. [L.B.] further testified about the physical altercation involving the father and the paternal grandmother where [L.B.] was strangled and abused by the father as she attempted to break up the father's attack on the paternal grandmother. She also described instances in January 2022, where the father was arrested for driving under the influence and the child testified the father and wife, [K.B.], were regularly intoxicated inside their home.
>
> The Court notes by the proof in this record that the father does not currently have a valid driver's license due to his DUI in January although [L.B.] had testified that he regularly drove the children to school around the time of the removal. The father had also been arrested for driving with no license in Jefferson County, Tennessee, sometime in the recent past.

16

The Court finds that there were numerous occasions, described by [L.B.], where the father's wife, [K.B.], regularly struck the children either with her hands physically or with other items. Disturbingly, the testimony indicates the father has allowed his wife to be abusive to the children at times when he was present. Much of the testimony from [L.B.] described numerous instances where the children were struck by [K.B.] with numerous objects and/or belts and threats were made to the children of physical assaults.

Further testimony in this record pointed to the father and [K.B.] abusing the children by shoving items of food down their throat to the point where they were gagging. The testimony concerning the treatment by the father and his wife was disturbing to the Court. [L.B.'s] testimony was very candid and believable as she described the abuse and threats to kill the children at times when [K.B.] was drunk. Apparently, much of her dissatisfaction focused on Aniya for reasons the Court was unable to uncover. The Court does believe that the step-mother, [K.B.], must have had a pretty extensive drinking history based on the descriptions in the testimony.

[L.B.] testified that when they lived with the father in a cabin that she made sure that all the children were ready for school and were dressed accordingly. She spent much time in the day-to-day care of the children and made sure that they were ready for bed and clean.

The Court notes that the father suffers from numerous mental problems which are described in the testimony. The father testified that he had been receiving therapy until January of last year and had been on a waiting list ever since that time due [to] problems with the therapist. Surprisingly he testified that he had tried to commit suicide in June 2021, and was hospitalized in Peninsula for a brief period of time. A review of the father's psychological evaluation indicates that in January 2023, he had been diagnosed with a borderline personality disorder (including anti-social traits) and Cannabis disorder. There were numerous recommendations concerning the father and the necessity of therapy which would have included at least appearances by the father on a regular basis. Apparently, there were also discussions concerning marital therapy with the father's wife as well as psychiatric treatment and therapeutic visitation with the children. Evaluations were important because they noted that the father had "very little insight into his conditions and circumstances" which would certainly support the difficulty the father was having with regard to visits and regulating himself on a day-to-day basis.

17

The Court notes that the father had completed a parenting assessment which indicated that he had participated in a batterer's intervention program, and was passing drug screens recently. The father testified today that he rents a trailer and has been living there since November 2022. Report of the [GAL] indicated the GAL had visited the trailer and inspected it. The Court notes there is no testimony in this record of payment of child support by the father and that there is no proof by the father of employment and/or rate of pay. The father did testify he had worked for a landscaping company but that he had not been getting the hours he needed. Further, the father had not filed any of his federal tax returns for the last two years. Clearly, as to both mother and the father, the record would indicate they had the ability to pay and simply did not pay child support as required by previous orders.

(Paragraph numbering omitted.)

In his appellate brief, Father argues that the trial court erred in determining that this statutory ground for termination of his parental rights to the Children had been proven. Father avers that at the time the Termination Petition was filed, Father had been "living in appropriate housing for a year," had "maintained stable employment" since before the Termination Petition was filed, and had "resolved all his criminal issues." Father does not address the allegations of physical abuse in his home, the Children's reactive behaviors after seeing him during visitation, his ongoing mental health issues, his deployment of a firearm inside the home with the Children present, or K.B.'s alleged addiction to alcohol.

Upon review, the evidence in the record overwhelmingly supports the trial court's finding, by clear and convincing evidence, that Father failed to manifest an ability or willingness to personally assume legal and physical custody of or financial responsibility for the Children. Each of the factual findings outlined by the trial court above is supported in detail in the record, as elicited from the testimony of Mother, L.B., Ms. Carroll, and Foster Mother. Indeed, the trial court could have recounted much more explicit and disturbing details regarding Father's abuse of Mother as well as Father's and K.B.'s abuse of the Children, L.B., and other family members who lived with Father and K.B. at various times.

In addition to the testimony introduced at trial, the psychological evaluation conducted as part of Father's permanency plan revealed that Father had been evasive regarding the accusations of abuse in his household and had failed to disclose prior mental health diagnoses, such as schizophrenia and borderline personality disorder. The evaluator concluded that Father's prognosis for effective parenting was "very low," and that reunification would "likely be unsuccessful." Furthermore, exhibits were introduced at trial regarding Father's criminal history, including an arrest for DUI and assault on a police officer in January 2022, to which Father pled guilty, prior to the Children's removal into DCS custody. Moreover, Ms. Carroll testified that the Children exhibited "active fear" at

the prospect of being returned to Father's care due to what the Children described to Ms. Carroll and Foster Mother as physical abuse inflicted upon each of them by both Father and K.B. Father's refusal to assume responsibility for financially supporting the Children is also supported by clear and convincing evidence, which we have thoroughly reviewed in analyzing the statutory ground of abandonment by failure to support.

For these reasons, we conclude that the evidence preponderates in favor of the trial court's determination that clear and convincing evidence proved that Father had failed to manifest an ability and willingness to maintain physical custody of or financially responsibility for the Children.

## 2. Substantial Risk of Harm

Concerning the second prong of this statutory ground, this Court has observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)) (footnotes omitted in *Maya R.*).

### a. Mother

Mother posits that even should the first prong of this ground be established, DCS failed to prove by clear and convincing evidence that placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to the Children. Mother argues that when discussing potential harm to the Children, DCS "continued to point towards the allegations against the Father" but alleged very few facts relative to Mother. Mother contends that the "only disclosure made by the children regarding being neglected by the Mother was that on two occasions, she left the children inside their hotel room while she stepped out to smoke a marijuana cigarette." According to Mother, she was "right outside the door" on these occasions. Mother argues that the finding of substantial harm by the trial court "completely ignores the evidence presented."

As this prong relates to Mother specifically, the trial court determined:

19

The Court now finds, as to the second prong of [this ground], that placing these children in the father or the mother's physical or legal custody would pose a substantial risk of harm to their physical and psychological welfare and is certainly not possible at this time.

* * *

The Court also noted that the mother was also difficult to assist during her visitation with the children. The children had expressed both to Ms. Carroll and [Foster Mother] their fear of the mother and continuing to live with her and her day-to-day lifestyle. The Court notes that the mother tested positive for THC very close to the day the hearing in this matter was held and that her stability and parenting skills were very unstable.

(Paragraph numbering omitted.)

The evidence before us preponderates in favor of the trial court's conclusions above. Mother admitted during her testimony that after the Children had been removed from her custody, she had continued to self-medicate with marijuana and had failed to secure stable housing. Mother stated that her HUD housing placement remained pending. Ms. Carroll, the DCS family services worker, testified that Mother had tested positive for "THC" (marijuana) the Tuesday before trial and produced a drug screen document verifying this assertion. Ms. Carroll also explained that Mother's housing situation continued to be "not appropriate" for care of the Children and that Ms. Carroll did not believe that unsupervised visitation between the Children and either parent would be "safe." Ms. Carroll described "reactive behaviors" exhibited by the Children following visits with both Mother and Father, including "night terrors, bed-wetting, sleepwalking," and violent behavior toward one another such as one of the Children "shoving a toothbrush" down another's throat and "push[ing] each other down the stairs." Ms. Carroll further testified that the Children "have assaulted each other pretty regularly after visitation and they report fear of going to either [Mother's or Father's] home." Ms. Carroll added that these "reactive" behaviors ceased when visitation with both Mother and Father was halted for several weeks by court order. When asked why DCS did not initiate a trial home placement with Mother specifically, Ms. Carroll responded that the Children "have the same reactive behaviors following [Mother's] visitation" as they do with Father.

Concerning the Children's specific fears at the prospect of returning to live with Mother, Ms. Carroll articulated that the Children had reported "being left alone" by Mother "for a long time" and feared what would happen if they were "left alone again." Although Ms. Carroll testified that the Children did not manifest the same "active fear" that they expressed regarding possibly returning to live with Father and K.B., she stated that they did express a fear of returning to Mother's custody due to their perception that she had previously abandoned them for long periods of time. Mother acknowledged that on a few

20

occasions she would leave the Children in the hotel room so that she could sit "outside the door smoking a blunt, marijuana." She also described one instance during which she sat in her car in the parking lot listening to music while the Children slept inside the hotel room. Mother stated that she would only be outside the room for "fifteen minutes, if that." The trial court apparently credited Ms. Carroll's testimony on this point as more reliable than Mother's testimony, and we will not overturn this determination. *See Jones*, 92 S.W.3d at 838. Mother also acknowledged that she had been physically abused by Father and then later by other boyfriends in the presence of the Children before they had been removed from her custody.

We find relevant to the "substantial risk of harm" inquiry the fact that the trial court credited significantly the testimony of Foster Mother regarding the Children's fears of returning to live with either Mother or Father and their improved behavior in the foster home:

> The testimony by the foster mother was enlightening as to the difficulty she had in initially parenting the children when they were relocated to her home. The testimony indicates that all children wish to stay in the care of the foster mother where they feel safe and stable. The Court finds that the children have been evaluated as being level II with regard to their needs and the foster mother has indicated that she would be a pre-adoptive home for the children.[3]

> The foster mother was very explicit in her descriptions of screaming, night terrors and problems with the children's behavior. The foster mother described the children initially as almost "feral" in their lack of ability to act appropriately and to engage in the day-to-day skills one would expect for children of their age. The foster mother described the therapeutic visitation as being somewhat helpful but the problems between [K.B.] and the mother were ongoing. The foster mother described issues concerning fights and problems which result in inappropriate behaviors by the children.

> The children initially came to the foster mother in May 2022, and were very aggressive and reactive with each other. They simulated stabbing or dangerous games that weren't normal for children of their age and they were

---

[3] "Level II" is a level of care requirements that DCS assigns to children and uses to place them in foster homes. During her testimony, Ms. Carroll explained: "A Level II means that [the child] is going to have more needs than a neurotypical or healthy child or a child without any mental health issues . . . Level II will be a kid with a more traumatic history. It'll be children that are on the spectrum or may have more medical needs than just a normal, basic child." The foster home in the instant case was designated as a "therapeutic foster home" intended to support the Children, who were determined to be Level II. Ms. Carroll explained that a "therapeutic foster home" has a "service provider agency" that supports the foster family by providing "therapy services" in the home.

very violent in their behaviors and relationship with each other. The foster mother described the child Aurora as being the usual target for the abusive behavior by the other children. Aniya was described as a very aggressive youth and that all were inappropriate with each other as it related to their "private parts." One of the physically abusive games the children played with each other was called "Katee" named after the father's wife. Foster mother described issues in the swimming pool at her home where they would hold each other under water and scratch and bite to an abnormal degree. The foster mother also noted that Aurora had asked her when they were going to "beat them" for their behavior, as each of the children believed this to be normal in their previous life.

The foster mother went on to describe the children's behavior as having much improved since they were placed in her home. The testimony indicates that the foster mother has spent a great deal of time in working with the children and attempting to modify negative behavior. The mother testified that Aniya had disclosed to her that the father had hurt her on numerous occasions and that had been a consistent pattern in her statements. The foster mother did also note that the children were very prone to be untruthful if they believed that they were going to be in trouble. In addition, she descried Aniya and Gabriel as having night terrors and that Aniya would wet the bed after she had visited with the parents on many occasions. On one occasion specifically, she recalled that the children were in the bathroom following a parental visit and that Aniya had attempted to stick a toothbrush down Aurora's throat. This required a visit to the emergency room.

She further testified that she has not heard the children request to go back with the mother or the father and that the therapy of the children has resolved some issues but much of it has been very difficult. The Court was very moved by the testimony of the foster mother in describing her dealings with the children which certainly must have resulted from the abuse and instability they have been forced to endure throughout their life.

Upon review, we determine that these detailed factual findings accurately reflect Foster Mother's testimony during trial, as well as that of Ms. Caroll. Foster Mother testified at length about what she described as "disturbing" behavior on the part of the Children when they first came to live with her. In addition, Foster Mother described that the Children exhibited self-harming behavior, inability to use eating utensils, fear of being beaten, narratives of sexual abuse, and evasiveness. Ms. Carroll explained that the Children had been living with Foster Mother since a few days after they were taken into DCS custody in May 2022 and that they had "bonded" with Foster Mother. Ms. Carroll corroborated Foster Mother's accounts of the Children's behaviors and further testified that each of the Children had told her that they were "scared" to return to the home of either

22

parent and that they would like to remain in the home with Foster Mother. According to both Foster Mother and Ms. Carroll, the Children's behaviors at home, at school, and at social functions had markedly improved during the time they had resided in the foster home.

This Court has previously determined that removing a child who has "bonded and thrived" with her current family amounts to substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (determining that the child would be at risk of substantial psychological harm if custody were restored to the father who had been apart from the child for five years and was a "virtual stranger"); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (concluding that placing the children in the mother's custody would put them at risk of substantial harm because the children were "very young" when they were removed and had "little to no contact" with the mother for more than a year).

Here, the Children have been in the foster home for over two and one-half years. During that time, the Children's behavior and performance in school have improved, and they have begun to participate positively in sports and other organized recreational activities. Foster Mother has expressed willingness and interest in adopting the Children. While the Children have been living with Foster Mother, both parents have had very limited visitation with them, and even these visits were halted for several weeks as to both parents after Foster Mother observed a marked deterioration in the Children's behaviors following the parental visits. Foster Mother described many conversations that she had engaged in with the Children during which she helped them to learn to self-regulate, to demonstrate kindness, and to manage their anger. Additionally, Foster Mother testified that the Children had bonded with her daughter, S.S., and her two sisters, whom the Children referred to as "aunts."

Accordingly, we conclude that the evidence preponderates in favor of the trial court's determination that DCS met its burden to show that the Children would suffer "substantial harm" if returned to Mother's custody.

b. Father

Concerning the second prong of this statutory ground as it relates to Father, the trial court found, as it did with Mother, that returning the Children to the care of Father would pose a substantial risk of harm to their physical and psychological welfare and that such return was "certainly not possible at this time." The trial court emphasized that according to Ms. Carroll, the Children "had a real fear of the [F]ather and [F]ather's wife" because of the physical abuse the Children had suffered at their hands. The trial court's findings concerning the Children's bond with Foster Mother and improvements in the Children's behavior, schoolwork, and participation in social activities while in Foster Mother's care

were the same relative to Father as they were to Mother and painted a compelling picture of three children who had been afforded a second chance at a positive, abuse-free, drug-free, and caring environment in their foster home. Upon review of the facts, we agree with the trial court's determination that placing the Children in Father's physical or legal custody would pose a substantial risk of harm to their physical and psychological welfare.

For the above-stated reasons, we affirm the trial court's determination that DCS met its burden to establish, by clear and convincing evidence, that both Father and Mother had failed to manifest an ability and willingness to assume physical custody of or financial responsibility for the Children and that returning the Children to the care of either parent would pose a substantial risk of harm to their physical and psychological well-being.

## V. Best Interest of the Children

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))).

Tennessee Code Annotated § 36-1-113(i) provides a list of twenty factors the trial court is to consider when determining if termination of parental rights is in a child's best interest:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

24

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual,

25

emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.,* 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). The best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

Under the previous statutory scheme utilizing nine similar best interest factors, our Supreme Court instructed regarding the best interest analysis as a whole:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861).

"After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See* In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the final judgment, the trial court considered each of the twenty best interest factors and determined that all of them weighed in favor of termination of both Father's and Mother's parental rights. Although we note that the trial court did not expressly employ the phrase, "clear and convincing evidence," when weighing the best interest factors, we find, upon our *de novo* review, that the evidence is clear and convincing that termination of both parents' parental rights is in the Children's best interest. *See State v. Cole*, No. W2002-03045-COA-R3-JV, 2003 WL 22071469, at * 5 (Tenn. Ct. App. Aug. 26, 2003) ("Notwithstanding the fact that the Trial Court did not employ the words 'clear and

convincing,' upon our *de novo* review, we find the evidence is clear and convincing that termination of [the father's] parental rights [is] in the children's best interest.").

Concerning factor (A), the trial court found that termination of both parents' parental rights will have a "positive impact" on the Children's need for stability and continuity. To arrive at this determination, the trial court contrasted both parents' housing instability, mental health problems, substance abuse, and Father's and K.B.'s physical abuse of the Children against the stable and "positive parenting" environment in the foster home. On appeal, Father argues that the Children's behavior had not stabilized or improved while in the foster home. Instead, he asserts that the Children have "remained in therapy, were lying, self-harming and bullying." However, the evidence presented at trial clearly demonstrated that the Children's behavior and stability had improved while in the foster home.

Foster Mother testified that the Children were "feral" and violent when they first came into her care in May 2022. By contrast, at the time of trial, Foster Mother described them as "confident," "helpful," "comfortable," "able to self-regulate," able to participate in activities with friends and neighbors, and able to treat themselves and one another with "joy" and "kindness." This testimony was corroborated by Ms. Carroll, who observed the Children in the foster home over time and noted their improved behavior. Moreover, both Ms. Carroll and Foster Mother testified that the Children's behavior became worse after visitation with both Mother and Father. Significantly, during a "six to eight week" hiatus when visitation with the parents had been stopped by the trial court at the request of the Children's therapist, the Children's behaviors markedly improved. For these reasons, we agree with the trial court that this factor weighs in favor of termination as to both parents. For the same reasons, we determine that a preponderance of the evidence supports termination as to factor (B), which relates to the effect a "change of caretakers and physical environment" would have on the Children's overall well-being.

The trial court determined that factor (C)—whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs—weighed heavily in favor of termination as to both parents. We agree. Neither parent has demonstrated continuity and stability in his or her housing arrangement or provided financial support for the Children at any time during the pendency of these proceedings. Regarding safety, Mother admitted to leaving the Children in a hotel room while she went outside to smoke marijuana on multiple occasions, and the evidence demonstrated that Father and his wife, K.B., had physically abused the Children to the point that the Children were "actively afraid" to be with him, even during supervised DCS visits. Neither parent expressed any interest in the Children's educational needs and how they were being met. Indeed, the only evidence concerning the Children's education came from Foster Mother, who described the Children's improved behavior and performance at school and their growing ability to socialize with school and neighborhood friends during extracurricular activities while in Foster Mother's care. Foster Mother detailed the specific

28

academic gifts and interests of each child during her testimony. By contrast, the testimony from Mother and Father regarding the Children's academic achievements and interests was sparse. During her testimony, Mother mentioned that Aniya had enjoyed cheerleading and dancing and that the Children had attended church regularly before they had been taken into DCS custody. During Father's testimony, he explained that when the Children were with him, he used to engage in a celebratory "family fun night" on weekends when the "kids did well in school[.]" The evidence preponderates in favor of the trial court's finding that this factor weighs in favor of termination as to both parents.

Turning to factor (D), the trial court focused on the Children's expressed fear of the parents and their desire to not be placed in either parent's custody. The trial court concluded that there was not a healthy attachment between the Children and either parent. The court noted that court intervention had been necessary to stop parental visitation due to the Children's "exhibited violent behavioral issues" and other reactive behaviors such as "night terrors" and "bed-wetting" following those visits with both parents. The psychological evaluator determined that reunification was not likely to be successful as to either parent given the parents' mental and substance abuse issues, as well as Father's evasive and untruthful answers to questions during the exam. Upon thorough review, we agree with the trial court that the evidence supports termination as to factor (D) concerning both parents. Noting that visitation with the parents was suspended by the court for a time and limited thereafter, we find that factor (E) also weighs in favor of termination as to both parents.

The trial court determined that factor (F)—whether the Children are fearful of living in the parents' homes—weighed heavily in favor of termination. The court emphasized the testimonies of Foster Mother and Ms. Carroll and determined that this combined testimony "clearly substantiates" the fear experienced by each of the Children concerning living with either parent. As discussed above in detail, the Children had expressed to both Foster Mother and Ms. Carroll that they did not wish to return to live with either parent. Ms. Carroll explained that the Children had an "active fear" of Father and K.B. and that the Children were afraid to return to live with Mother because they feared being left unattended for extended periods of time. Foster Mother described that she would have to "physically force" the youngest child, Gabriel, into the car to attend a visit with either parent and that he would say to her "I don't want to go back, why do they make me go back." Upon review, we agree with the trial court that this factor weighs in favor of termination.

Factor (G) concerns whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms. The trial court found that this factor weighed heavily in favor of termination as to both parents. The testimony reviewed above illustrates that the Children would exhibit violent behaviors, night-terrors, bed-wetting, and other "reactive" behaviors upon return from visits with either parent. These symptoms indicate that each parent personally triggered and exacerbated the Children's experiences of trauma. In addition, there was

significant testimony regarding the abuse inflicted upon the Children by K.B., Father's wife, to the point that the Children invented a game named after her during which they would "beat each other." Although Mother argues on appeal that most of the evidence was relative to Father concerning abuse in the home, the testimony revealed that Mother left the Children in the care of her sister-in-law on several occasions to go "drinking and clubbing" through the night and on one occasion to check herself into a "psych-ward." These instances of neglect rendered the Children afraid to return to Mother's care for fear of being left alone. Moreover, there was testimony from Mother herself that she was abused by Father and other boyfriends while the Children were present. The evidence preponderates in favor of the trial court's finding that factor (G) weighs in favor of termination of both parents' parental rights.

Regarding factor (H)—whether the children have created a healthy parental attachment with another person or persons in the absence of the parent—the trial court found that the Children had "created a wonderful relationship with the foster mother which is now pre-adoptive." Foster Mother recounted great strides in working with the Children to improve their behavior, maintaining contact with DCS workers, arranging for medical and therapeutic help and counseling for the Children, observing and monitoring the Children's behaviors, addressing the Children's needs openly with each of them, and working through their respective behavioral issues. Foster Mother also related that the Children had bonded with Foster Mother's daughter and sisters. For these reasons, we agree with the trial court that factor (H) weighs in favor of termination as to both parents.

The trial court determined that factor (I) weighed heavily in favor of termination because the Children "now have a wonderful familiar relationship" with Foster Mother, who was establishing a home for them with their foster siblings. For the reasons outlined in factor (H), we agree with the trial court. However, this factor is not concerned merely with the relationships between the Children and Foster Mother and the foster family but considers the impact that termination will have on the Children's access to information and relationships from their biological roots and heritage. There was minimal proof about either parent's biological family except that each parent has a volatile relationship with his or her own mother. According to Father, his mother assaulted him with a cast-iron skillet the night the Children were removed from his custody. According to Mother, she checked herself into a "psych ward" in part because she wanted to kill her own mother due to her mother's substance abuse and mental health problems. Foster Mother described a conversation during which Aurora and Gabriel told her that a grandmother—the evidence being unclear whether maternal or paternal—had "given them away" to a man who had sexually abused both of them. Upon review, we determine that this factor weighs in favor of termination because there was no evidence presented that the Children maintained any positive or emotionally significant relationships with any members of their biological family, including Mother and Father.

30

The trial court determined that factor (J)—whether the parent has demonstrated a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home—weighed heavily in favor of termination as to both parents. The evidence established that Mother continued to use marijuana until the week before trial and that Father's wife continued to consume alcohol, a habit that had led in the past to violent episodes. The trial court noted that Mother continued to lack appropriate housing and that neither parent had addressed his or her ongoing mental health issues. Moreover, both parents continued to exhibit substance abuse problems and carelessness in exposing the Children to dangerous and violent situations. We therefore find that this factor weighs in favor of termination of both parents' parental rights to the Children. For the same reasons, we determine that factor (M)—whether the parent has demonstrated a sense of urgency in seeking custody of the child or addressing conditions that made an award of custody unsafe—and factor (O)—whether the parent has ever provided safe and stable care for the child—also weigh in favor of termination as to both parents.

Factor (K) concerns whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions, and factor (L) considers whether DCS has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in DCS custody. We determine that both factors weigh in favor of termination of each parent's parental rights to the Children. DCS set forth a permanency plan for each parent, and each participated in that process. Mother's permanency plan required her to, *inter alia*, obtain and maintain appropriate housing with "electricity, running water and heating"; to refrain from drug use; and to submit verification of income and appropriate transportation. Mother did not comply with any of these delineated requirements and did not financially support the Children as required. Father was successful in completing several of the requirements of his parenting plan, such as completing an anger management class, obtaining consistent employment, and checking in with his probation officer regarding his outstanding criminal offenses. However, Father did not comply with other requirements, such as securing transportation, financially supporting the Children, or maintaining stable housing. DCS offered assistance to both parents by paying for psychological evaluations, as well as parenting and drug assessments, and assisting the parents with therapeutic visitation with the Children.

The trial court determined that factor (N)—whether the parent had shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult—applied to the instant case and that the record "clearly" indicated that this factor weighed heavily in favor of termination as to both parents. Upon review, we agree. The record established that Father and his wife had been physically abusive to the Children to the degree that the Children were afraid to visit with Father for even a brief amount of time. The record further demonstrated that Father had physically abused Mother and had assaulted others, including a police officer, resulting in a criminal charge to which Father pled guilty. Although Mother was not shown to have physically abused the

31

Children, she had exhibited chronic negligent behavior by leaving the Children alone in a hotel room while she smoked marijuana outside the room and by leaving the Children with her sister-in-law overnight on several occasions while Mother consumed alcohol and spent time at clubs. Mother's own testimony evinced that although she did not personally harm the Children, she exposed them to abusive behavior from Father and other men she lived with over time.

Concerning factor (P), the trial court specifically found that neither Father nor Mother exhibited a "sufficient understanding of the basic and specific needs required for the [C]hildren to thrive." We agree. The record demonstrates that Father consistently exposed the Children to physical and emotional abuse at his own hands and those of his wife. Mother lived with the Children alternately in a hotel room and in a home with no running water or working kitchen. She exposed them to a revolving door of boyfriends and other strangers while she socialized through the night and left the Children alone so that she could smoke marijuana. Therefore, the evidence preponderates in favor of the trial court's determination that factor (P) weighs in favor of termination. For the same reasons, factor (Q) weighs in favor of termination as to both parents because neither parent has demonstrated either the ability or commitment to create and maintain a home that meets the Children's basic and specific needs.

The trial court determined regarding factor (R) that "the types of abuse described at the hands of the father and the mother and outlined within this record, clearly indicate this factor weighs in favor of termination." Upon review, we note that Father had secured a "three-bedroom, two-bathroom trailer" for the Children to live in around April 2022 and had maintained that home during the pendency of this action. However, we reiterate that Father's home was rife with violent episodes and alcohol abuse, an environment that is not healthy for a child or conducive to a child's development. As stated above, Mother did not appear to have been physically abusive toward the Children according to the testimony of L.B., but the physical environment of her dwellings—where she would "bounce back and forth" between living in a hotel, living with various relatives, or residing in homes with no kitchen or running water—was not appropriate for the Children to thrive and develop. In addition, Mother's continued drug use while the Children remained in her custody likely contributed to her neglect of the Children. Accordingly, factor (R) weighs in favor of termination as to both parents.

Concerning factor (S), the trial court stated that "it is important to realize, that neither parent has provided any support for these children other than minimal support as set forth in the record." Indeed, the evidence reviewed by this Court above concerning the statutory ground of abandonment by failure to support clearly demonstrates that neither parent financially supported the Children during the Determinative Period. Therefore, factor (S) weighs in favor of termination as to both parents.

32

Factor (T)—whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision for the child—also weighs in favor of termination as to both parents. As discussed at length above, Mother suffered from several mental disorders including bipolar disorder, post-traumatic stress disorder, anxiety, depression, and substance abuse involving marijuana. Mother testified that she was prescribed medication for some of these illnesses but that she continued to use marijuana and other non-prescribed drugs to self-medicate for these conditions. The record demonstrates that Father had been diagnosed, at various times, with schizophrenia, bipolar and psychotic disorder, and borderline personality disorder. Significantly, the psychological evaluation completed in June 2023 for Father indicated that Father exhibited a "distinct pattern of volatility in many of his relationships, a history of impulsive behaviors including illicit substance use and sexual promiscuity," and that these and other issues were "demonstrated by a long history of assaultive behaviors." The evaluator described Father as presenting "with several antisocial traits as an adult" and stated that Father was so "defensive" in answering questions that a proper diagnosis was difficult. Upon review, we determine that factor (T) weighs in favor of termination as to both parents.

Considering the entirety of the applicable factors, we conclude that the evidence weighs soundly in favor of terminating both Mother's and Father's parental rights to the Children. In the two years following the Children's removal from Father's home in May 2022, Mother had continued to live in unstable housing and to smoke marijuana, despite having custody of her youngest child by another father. The Children did not wish to return to Mother's custody for fear of being left alone. Mother did not financially support the Children, and the Children demonstrated reactive behaviors after visiting with her. Father and his wife had physically abused the Children to the point that the Children were afraid to visit with him and expressed a strong desire to not be returned to his custody. Moreover, Father had displayed a history of violent behavior and criminal conduct, including assault of a police officer and multiple instances of driving under the influence. Although Father had secured what appeared to be a stable job and stable housing by the time of trial, Father did not financially support the Children, and his statements that he was not aware of his obligation to provide financial support to them are unpersuasive. We therefore find, by clear and convincing evidence, that termination of Mother's and Father's parental rights is in the Children's best interest.

VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's and Father's parental rights to the Children and for collection of costs below. Costs on appeal are assessed one-half to the appellant, Tananeka S., and one-half to the appellant, Zachary B.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE